**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Robert E. Blackburn**

Civil Action No. 09-cv-01604-REB-BNB

WESTERN WATERSHEDS PROJECT,

      Plaintiff,

v.

ROBERT J. LEAVERTON, in his official capacity as Forest Supervisor, Pike and San
Isabel National Forests, and
U.S. FOREST SERVICE,

      Defendants,

and

COLORADO CATTLEMEN'S ASSOCIATION, a nonprofit corporation, on behalf of its
members, and
BOARD OF COUNTY COMMISSIONERS FOR CHAFFEE COUNTY, COLORADO,

      Defendant-Intervenors.

---

**OPINION AND ORDER**

---

**Blackburn, J.**

      The matter before the court is plaintiff's appeal seeking judicial review of the

decision of the United States Forest Service to re-authorize livestock grazing in the Pike

and San Isabel National Forests, while incorporating principles of adaptive management

to improve environmental conditions in the forests.  The matter has been fully briefed

(#22, 24-26),[1] and defendants have submitted the administrative record to the court

---

      [1]  "(#22, 24-26)" is an example of the convention I use to identify the docket
number assigned to a specific paper by the court's case management and electronic
case filing system (CM/ECF) and the specific pages within that document. I use this

(#21, 29).  After reviewing the briefs and the administrative record, the court **AFFIRMS** the decision of the Forest Service.

## I. JURISDICTION

The court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question), in combination with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (review of final agency action).[2]

## II. FACTUAL AND PROCEDURAL BACKGROUND

This matter relates to the decision of the Forest Service to re-issue permits for livestock grazing, while incorporating "adaptive management" strategies, in approximately 284,400 acres of the Pike and San Isabel National Forests in Colorado. (# 22, at 3; # 25, at 8.)  Specifically, in September 2008, the Forest Service issued a Final Environmental Assessment ("EA") in which it evaluated livestock grazing in conjunction with "how well ecosystem processes are functioning" in the national forests at issue. (# 29, at S05935-6095, S05943).[3]  The EA recognized that, of the 29 benchmark areas,[4] "10 are currently meeting the desired [environmental] conditions, 9

convention throughout this order.

[2] Plaintiff's complaint is properly construed as bringing claims under the judicial review procedures of the APA, alleging violations of the National Forest Management Act and the National Environmental Policy Act.  (*See* # 1, at 9-12.)  **See Utah Envtl. Cong. v. Russell**, 518 F.3d 817, 823 (10th Cir. 2008) ("As neither the NFMA nor NEPA provide a private right of action, we review the Forest Service's [decision] as a final agency action under the Administrative Procedure Act (APA).").

[3] The Forest Service had previously issued Draft EAs in February 2007 and July 2008, which included public comment periods.  (*Id.* at S05378-5543, S05592-5751, S06121-6276.)

[4] Benchmark areas "are the small areas where long-term trend studies are installed and maintained so that the manager can assess the resource impacts from management."  (*Id.* at S06004.)

are adequately moving toward meeting the desired conditions and 10 are not meeting or

adequately moving toward the desired conditions." (*Id.* at S05943.)  The EA considered

three alternative courses of action.  (*Id.* at S05965-67.)  The first was "No Action,"

whereby livestock grazing would no longer be permitted and existing grazing permits

would be phased out.  (*Id.* at S05965.)  The second was "No Change," whereby grazing

would continue as it had before.  (*Id.* at S05965-66.)  The third was the "Proposed

Action," whereby grazing would continue at the same levels, but under adaptive

management by land managers who would "implement management practices that are

designed to meet [Forest Plan[5]] standards and guidelines." (*Id.* at S05966-67.)  The

Forest Service acknowledged that the

> need for the proposed action is based on the knowledge that a change in
> management needs to occur.  This need for change in management is
> identified by comparing what currently exists on the landscape in the
> [national forests at issue] and to specific descriptions of what should exist
> in those different community types across the project area.

(*Id.* at S05946.)  In order to implement the Proposed Action, the Forest Service created

various grazing management options for managers to implement, as part of an Adaptive

Management Toolbox (*id.* at S05967); various design criteria for managers to focus on

particular areas and wildlife species (*id.* at S05968-75); and both a short-term and long-

term monitoring plan (*id.* at S05978-82).[6]

---

[5] Forest plans ("land and resource management plans") are designed to create "general, forest-wide planning goals."  ***Utah Envtl. Cong. v. Bosworth***, 443 F.3d 732, 737 (10th Cir. 2006).  They are created pursuant to 16 U.S.C. § 1604.

[6] It should be noted that, during the public comment period, a group of five environmental organizations – Colorado Wild, Wild Connections, Rocky Mountain Chapter of Sierra Club, Great Old Broads For Wilderness, and Center For Native Ecosystems – submitted a letter stating

> We commend the Forest Service for proposing intensive adaptive
> management in order to achieve desired resource conditions in the project

On September 24, 2008, two district rangers issued Findings of No Significant Impact ("FONSI"), in which they approved the Proposed Action to allow continued grazing under adaptive management. (*Id.* at S06277-6302.) The FONSIs concluded that the Proposed Action "is not a major action that will constitute a significant effect on the human environment," therefore, obviating the need to prepare an Environmental Impact Statement. (*Id.* at S06287, S06300.) Plaintiff filed an administrative appeal challenging the FONSIs. (*Id.* at S06305-6390.) On January 14, 2009, the Forest Supervisor denied the appeal and upheld the FONSIs. (*Id.* at S06437-83.)

Plaintiff initiated this action on July 7, 2009, filing a Complaint against the U.S. Forest Service and the Forest Supervisor under the APA, alleging violations of the National Forest Management Act ("NFMA") and the National Environmental Policy Act ("NEPA"). (# 1.) Defendants filed an Answer on September 8, 2009. (# 9.) On October 2, 2009, the Colorado Cattlemen's Association and the Board of County Commissioners for Chaffee County, Colorado, filed a motion to intervene in the action. (# 10.) The court granted the motion to intervene on November 16, 2009. (# 19.) On December 18, 2009, plaintiff filed its Opening Brief. (# 22.) On February 18, 2010, defendants and defendant-intervenors filed their respective Response Briefs. (# 24, 25.) On March 18, 2010, plaintiff filed a Reply Brief. (# 26.) Defendants filed the administrative record (# 21), and later filed a supplemented administrative record (# 29).

---

area. We find the Adaptive Management Tool Box (EA at 28) and the project's Design Criteria (*id.* at 29-35) to be fairly strong. Implementation of these measures and careful monitoring to determine the need for specific management will be needed to address problems on all of the allotments, some of them rather severe.

(*Id.* at S06421.)

The court took the papers under submission without oral argument.  (# 30.)

## III.  STANDARD OF REVIEW

The APA provides that a reviewing court shall set aside agency action if it is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "Our review is highly deferential."  ***Ecology Ctr., Inc. v. U.S. Forest Serv.***, 451 F.3d 1183, 1188 (10th Cir. 2006) (citation and internal quotation marks omitted).  "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action."  ***Citizens' Comm. to Save Our Canyons v. Krueger***, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation and internal quotation marks omitted).

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment.  Generally, an agency decision will be considered arbitrary and capricious if the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

***Friends of the Bow v. Thompson***, 124 F.3d 1210, 1215 (10th Cir. 1997) (citations and internal quotation marks omitted).  A reviewing court should engage in a "thorough, probing, in-depth review."  ***Wyoming v. United States***, 279 F.3d 1214, 1238 (10th Cir. 2002) (citation omitted).  However, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  ***Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.***, 463 U.S. 29, 43 (1983).  "Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of

expertise." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

## IV. ANALYSIS

### A.     NFMA CHALLENGE

Plaintiff first argues that the decision of the Forest Service to implement the Proposed Action violates NFMA because the decision fails to comply with the Forest Plan's requirements of protecting wildlife habitat, soil productivity, water quality, and archaeological resources.  (# 1, at 12; # 22, at 11-21.)

### 1.     Overview of NFMA

"NFMA establishes a two-step process for forest planning.  First, the Forest Service prepares a forest plan." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006) (citation and internal quotations omitted).  *See* 16 U.S.C. § 1604(a) (providing that the Forest Service shall "develop, maintain, and, as appropriate, revise land and resource management plans ["forest plans"] for units of the National Forest System.").  A forest plan is designed to create "general, forest-wide planning goals." *Bosworth*, 443 F.3d at 737.  *See also Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008) (stating that a forest plan consists of "broad directives for management of a given forest"); *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1155 (10th Cir. 2007) (stating that a forest plan is "a document that creates a *vision* [for the] management of a national forest").  "[E]ach forest plan envisions the forest will be used for multiple purposes, including 'outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness.'  At the same time, the forest plan provides for 'diversity of plant and animal communities based on the suitability and capability of the specific land area.'" *Bosworth*, 443 F.3d at 737 (quoting 16 U.S.C. § 1604(e)(1), (g)(3)(B)).

"Second, the Forest Service is required to implement the forest plan by approving or disapproving specific projects.  Projects must be consistent with the governing forest plan . . . ."  **Silverton Snowmobile Club**, 433 F.3d at 785 (citation and internal quotations omitted).  *See* 16 U.S.C. § 1604(i) (providing that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans").

### 2. The Forest Plan at Issue

The Forest Plan for the Pike and San Isabel National Forests was approved in 1984.  (*See* # 29, at S01189-1782.)  The stated purpose of the Forest Plan is

> to provide a management program reflecting a mix of management activities that allows use and protection of the Forest's resources, fulfills legislative requirements, and addresses local, regional, and national issues. . . .  The major purpose of this Forest Plan is to create and maintain a vigorous and healthy forest.  Physical, biological and economic resources are the basic requirements of a healthy forest environment. . . . Diversity and permanence are the keys to healthy environments.  The permanence of healthy forest communities is dependent upon the diversity of plants and animals and their management.  The permanence of a vigorous and healthy society is also dependent upon the diversity of resources available and upon the options for their use.

(*Id.* at S01212-13.)  The Forest Plan lists goals of the Plan, objectives designed to meet those goals, management requirements that govern how activities will be implemented, and monitoring and evaluation requirements to determine the progress toward achieving the goals, objectives, and management requirements.  (*Id.* at S01192, S01337-1585.) In terms of the listed goals, the Forest Plan includes goals related to preserving the natural environment (*see, e.g.*, *id.* at S01337-39 ("Increase diversity for wildlife and habitat improvement," "[i]mprove fish habitat," "[i]mprove the health and vigor of all vegetation types," "[m]aintain or improve water quality," "[m]aintain air quality," "[p]rotect riparian areas and wetlands from degradation," "[c]onserve water and soil resources")),

as well as goals related to the productive use of the forests and its resources (*see, e.g.*, *id.* ("Provide a broad spectrum of developed and dispersed recreation opportunities," "[p]rovide for productive use of range forage," "[p]rovide for increased production and productive use of wood fiber," "[e]ncourage mineral exploration, development and extraction consistent with management of surface resources," "[r]ecommend areas on the Forest that are suitable for oil and gas leasing activities," "[p]rovide the opportunity for economic growth of industries and communities dependent upon Forest outputs")).

### 3.     Is the Forest Service's Decision Consistent With the Forest Plan?

The first question at issue is whether the Forest Service decision to implement the Proposed Action is "consistent with" the Forest Plan.  *See* 16 U.S.C. § 1604(i); **Silverton Snowmobile Club**, 433 F.3d at 785.  Plaintiff's argument that the Proposed Action violates the Forest Plan is premised on its contentions (1) that the Forest Service has violated the Forest Plan in the past by allowing levels of livestock grazing that have resulted in environmental degradation of the national forests; and (2) that there are insufficient guarantees that the Proposed Action will have any different result, given that the Proposed Action continues to authorize the same levels of grazing.  The argument is not sufficiently persuasive to warrant a finding that the decision of the Forest Service to implement the Proposed Action was arbitrary and capricious.

As an initial matter, it should be emphasized that the Forest Plan clearly envisions livestock grazing in the national forests at issue.  For example, the Forest Plan states,

> Current permitted grazing use on the Pike and San Isabel National
> Forests is approximately 10,400 head of cattle, 84 head of horses, and
> 5,000 sheep grazed for about 40,000 animal unit months (AUM's).  By the
> year 2030, demand is expected to be about 60,000 AUM's. . . .  Many
> National Forest areas were severely overgrazed in the past resulting in

> erosion and reduced productivity.  Livestock numbers were reduced and
> rehabilitation projects such as reseeding, terracing, check dams and tree
> planting were accomplished.  Some problem areas still exist, usually as a
> result of improper livestock distribution.  Efforts are underway, or are
> planned, to resolve these problems through development of new water
> sources, fencing, improved grazing management systems and in a few
> cases, reduced stocking.

(# 29, at S01284-85.)  In the same way that the Forest Plan envisions allowing livestock grazing while taking steps to protect or improve environmental conditions, the Forest Service's recent Proposed Action re-authorized grazing permits while creating management tools and design criteria to protect or improve environmental conditions. Thus, on this general level, the Forest Plan and the Forest Service's Proposed Action appear to be consistent.

On a more specific level, plaintiff argues that the Proposed Action violates the Forest Plan in various ways:

### a. Wildlife Protection

Plaintiff argues that the Proposed Action violates the Forest Plan's requirement that the Forest Service "provide habitat for viable populations of all native vertebrate species of fish and wildlife." (# 29, at S01366.)[7]  In the Final EA, the Forest Service conceded that the best course for threatened wildlife habitats would be to discontinue livestock grazing.  (*See id.* at S06015 ("Under Alternative A (No Grazing), the lack of grazing would allow degraded habitat conditions to improve and recover (where possible) more fully and at a higher rate than the Action Alternatives [B & C].").)  However, of course, the Forest Service could not evaluate the goal of wildlife habitat

---

[7] Plaintiff's topic heading for the relevant section of its Opening Brief, by its very words, suggests that the Proposed Action is *consistent with* the Forest Plan: "Design Criteria for Wildlife [listed in the Proposed Action] *are not materially different from* currently existing Forest Plan standards." (# 22, at 12 (emphasis added).)

protection in a vacuum and concluded that

> the Proposed Action, through effective and timely monitoring and the implementation of appropriate adaptive management options that are implemented using the design criteria could facilitate riparian and other habitats recovery and improved conditions overtime where possible. Thus, the Proposed Action would have substantially less impacts compared to Alternative B, although these impacts would not be eliminated.

(*Id.*)

The EA went on to analyze the effects of the three alternative courses of action on specific endangered and threatened species.  (*See id.* at S06009-42.)  For example, the EA analyzed the effects of the three alternative courses of action on the Mexican spotted owl ("MSO").  (*See id.* at S06019-24.)  The Forest Service concluded that the Proposed Action would "not [be] likely to adversely affect" the MSO.  (*Id.* at S06024.)  As part of that analysis, the Forest Service referenced "design criteria that directly or indirectly reduces/minimizes adverse affects to MSO, their prey, or their habitats."  (*Id.*)  One such design criteria, Design Criteria No. 56, states, "Mexican Spotted Owl: . . . Manage livestock grazing in riparian areas to maintain or achieve a preponderance of mid seral or higher condition to provide cover and forage for prey species where the potential occurs."  (*Id.* at S05973.)  As plaintiff mentions, this Design Criteria is similar to directions, standards, and guidelines listed in the Forest Plan.  For example, the Forest Plan lists as a direction to "[m]anage riparian areas to reach the latest seral stage possible within the stated objectives," and lists as a standard and guideline to "[m]aintain all riparian ecosystems in at least an upper mid-seral successional stage." (*Id.* at S01384.)Plan.[8]  Thus, the Proposed Action appears to be "consistent with" the

---

[8] The Forest Plan does not specifically mention the MSO.

Forest Plan as to the MSO.  *See* 16 U.S.C. § 1604(i); ***Silverton Snowmobile Club***, 433 F.3d at 785.

Despite this, plaintiff argues that the history of the Forest Service of failing to follow Forest Plan requirements shows that the Forest Service will be similarly ineffective in implementing the management tools and design criteria in the Proposed Action.  (# 22, at 12-14.)  This court is not in a position to so presume.  In the EA, the Forest Service acknowledged that "a change in management needs to occur."  (# 29, at S05946.)  In the specific list of what changes need to occur in each area, the Forest Service repeatedly listed "maintain or improve riparian areas."  (*Id.* at S05947-57.)  Then, in the Forest Service's analysis related to the MSO, the Forest Service stated that continuing livestock grazing at existing levels *without* utilizing adaptive management "could result in a continued degraded habitat condition [for the MSO]."  (S06021.)  The EA recognized the potential dangers to MSO habitats from unchecked grazing, concluded that a change in management needs to occur, and selected a course of conduct that has as one of its goals to manage livestock grazing in riparian areas to improve conditions for MSO habitats.  The court cannot assume that the Forest Service will fail to achieve this goal.  Instead, the court concludes that the Forest Service's decision as to the MSO was not arbitrary and capricious.  ***See Friends of the Bow***, 124 F.3d at 1215 ("In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment.").

Plaintiff makes the same argument as to the Canada lynx and the boreal toad.  (*See* # 22, at 14-18.)  The Proposed Action contains five design criteria for improving the habitat of the lynx, and six design criteria for improving the habitat of the boreal

toad.  (# 29, at S05972-73.)  As for lynx, the EA concludes that implementation of these design criteria "would minimize adverse effects of grazing on lynx and their prey. . . . Livestock grazing within these allotments would be subject to the appropriate design criteria to achieve desired conditions." (*Id.* at S06027.)  The EA concluded similarly that implementation of the design criteria would improve the habitat of the boreal toad.  (*See id.* at S06033-34.)  Plaintiff does not explain how these design criteria are inconsistent with the Forest Plan, other than to argue that protecting wildlife habitats has long been a requirement under the Forest Plan, but the Forest Service has failed to meet this requirement in the past, and there are insufficient guarantees that the Proposed Action will remedy the situation.  (*See* # 22, at 14-18.)  Again, this court may not assume that the Forest Service will fail to implement the design criteria to improve the habitats of the lynx and the boreal toad.

Thus, the court concludes that the decision of the Forest Service to implement the Proposed Action was not arbitrary and capricious in terms of protection of wildlife habitats.

**b.    Protecting Soil Productivity**

Plaintiff's argument regarding protection of soil productivity is the same: "the Forest Service is *already required* [by the Forest Plan] to protect [against] long-term soil loss, and has not done so, but is now giving no reason why it will suddenly begin to do so."  (# 22, at 19 (emphasis in original).)

The Forest Plan lists as general directives to "[m]aintain soil productivity, minimize man-caused erosion, and maintain the integrity of associated ecosystems" and to "[p]revent livestock and wildlife grazing which reduces the percent of plant cover to less than the amount needed for watershed protection and plant health."  (# 29, at

S01406.)  These directives appear to be "consistent with" the Proposed Action.  16

U.S.C. § 1604(i); *Silverton Snowmobile Club*, 433 F.3d at 785.  The Forest Service

concluded that, by implementing the Proposed Action, "vegetative cover should be

increased on all upland and riparian areas" "[s]oil retention on sites should be

improved," and "[p]otential soil erosional losses would be reduced from current levels in

selected riparian and upland areas."  (# 29, at S06081.)  The Proposed Action proposed

to achieve these goals by adopting management changes affecting the "timing, intensity

frequency, [and] shortening of seasons" for livestock grazing, as well as by "[l]imiting

grazing to capable areas, placement of salt in upland locations, water improvements,

fencing, and frequent rotation of cattle."  (# 29, at S06080-81, S05967.)  The court may

not assume that the Forest Service will fail to implement these measures to improve soil

productivity.

   **c.**  **Protecting Water Quality**

  Plaintiff's argument regarding protecting water quality is the same:

> Water quality is not going to improve with more design criteria that only
> reiterate requirements that already exist in the Forest Plan, and it is
> certainly not going to improve if the Forest Service pays the same heed to
> its design criteria that it has historically paid to its Forest Plan standards.

(# 22, at 20-21.)  Here again, plaintiff's own language concedes that the Proposed

Action, and more specifically the design criteria contained within it, are consistent with

the Forest Plan.  Plaintiff's argument is based entirely on its uncircumstantiated doubt

that the design criteria will be effectively implemented.  The court may not find the

decision of the Forest Service to be arbitrary and capricious based on a belief that

future management plans will not be effectively implemented.[9]

### d.  Protecting Archaeological Resources

The Forest Plan contains a general directive to "[a]void disturbance of known cultural resources until evaluated and determined not significant." (*Id.* at S01351.)  The EA evaluated the three alternative courses of action on archaeological resources and concluded that the Proposed Action would have a lesser effect on archaeological sites than prior grazing practices did because of the possibility of utilizing, *inter alia*, fewer grazing days and more rotations of livestock in areas of cultural importance.  (*Id.* at S06088, S05967.)  The court concludes that plaintiff has not shown the Proposed Action to be inconsistent with the Forest Plan.

## B.  NEPA CHALLENGES

Plaintiff argues also that the Forest Service violated NEPA in two ways:  first, that the Forest Service wrongfully failed to issue an Environmental Impact Statement ("EIS") pertaining to the Proposed Action; and second, that the Forest Service failed to analyze a reasonable range of alternatives to its chosen course of action.  (# 1, at 9-12; # 22, at 22-28.)

### 1.  Overview of NEPA

"NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."  ***New Mexico ex rel. Richardson v. Bureau of***

---

[9] One of the management techniques envisioned by the EA to improve water quality is the establishment of new watering sites to draw livestock away from riparian areas.  (*See* # 29, at S06074-77.)  Plaintiff argues that the Proposed Action is not specific enough regarding how many watering sites will be built, where they will be built, or how they will function.  There is no requirement under NFMA that the Forest Service detail its plans with that level of specificity.

*Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009).   "NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct."   *Russell*, 518 F.3d at 821.   "Rather, once environmental concerns are adequately identified and evaluated by the agency, NEPA places no further constraint on agency actions."   *Friends of the Bow*, 124 F.3d at 1213 (citations and internal quotation marks omitted).

> In conducting this analysis, the Forest Service must prepare one of the following:  (1) an environmental impact statement, (2) an environmental assessment, or (3) a categorical exclusion.  An environmental impact statement involves the most rigorous analysis, and is required if a proposed action will "significantly affect[ ] the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4.

> If an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed environmental assessment.  40 C.F.R. § 1508.9.  An environmental assessment provides "sufficient evidence and analysis" to determine whether a proposed project will create a significant effect on the environment.  *Id.*  If so, the agency must then develop an environmental impact statement; if not, the environmental assessment results in a "Finding of No Significant Impact," and no further agency action is required.  *Id.*

*Bosworth*, 443 F.3d at 736.  NEPA does not "require agencies to elevate environmental concerns over other appropriate considerations; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action.  In other words, it prohibits uninformed – rather than unwise – agency action."  *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1178 (citation and internal quotation marks omitted).

### 2.   Did the Forest Service Wrongfully Fail to Issue an EIS?

In reviewing the decision of the Forest Service to issue a FONSI and not prepare

an EIS, the court must determine "whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (citation and internal quotations omitted). It is plaintiff's burden to show that the agency's conclusion "represents a clear error of judgment." *Id.*

Plaintiff argues that the Forest Service violated NEPA by failing to issue an EIS because, given past environmental harms due to grazing and ineffective management, there is insufficient indication that the Forest Service will improve environmental conditions through its Proposed Action. Again, this court is not in a position to so presume. The Forest Service has identified environmental problems within the national forests at issue, stated that a change in management needs to occur, and specified the tools managers should use in moving the conditions in those areas toward desired conditions. Further, the Forest Service has implemented monitoring requirements for managers in order to ensure that conditions move toward desired conditions.[10] *See Greater Yellowstone Coalition*, 359 F.3d at 1275 (holding that an EPA decision did not amount to a clear error in judgment where the EPA concluded that the proposed

---

[10] Regarding the adequacy of monitoring, Plaintiff emphasizes a statement from the FONSIs that the Proposed Action "[a]pplies adaptive-management practices, using a minimum of 3 years of monitoring data to determine if permanent significant adjustments in term permit numbers or seasons are necessary." (# 29, at S06282, S06295. *See also* # 22, at 10, 18, 21, 25, 27, 28.) This statement applies only to significant and *permanent* adjustments in livestock numbers or seasons for grazing. Indeed, the FONSIs continue, "Minor adjustments or annual practice adjustments can be made *immediately* . . . ." (# 29, at S06282, S06295 (emphasis added).) Also, this statement from the FONSIs does not speak to the multitude of other options, other than changing livestock numbers and seasons, available to managers to improve environmental conditions. Myopic focus on this one statement from the FONSI fails to consider the more detailed plan in the EA for "implementation monitoring" (short-term monitoring) and "effectiveness monitoring" (long-term monitoring). (*Id.* at S05978-82.)

action would not have a significant impact on a particular river and where the EPA

implemented monitoring requirements in case its conclusion was wrong).  The Forest

Service did not make a clear error of judgment by conducting an EA and issuing a

FONSI, rather than developing and issuing an EIS.[11]

### 3. Did Plaintiff Waive Any Challenge to the Forest Service's Alleged Failure to Analyze a Reasonable Range of Alternatives By Failing to Raise the Issue During the Course of Administrative Proceedings?

Defendants argue in their Response Brief that plaintiff waived any challenge to

the Forest Service's alleged failure to analyze a reasonable range of alternatives

because plaintiff failed to advance any specific counter-proposals during the course of

administrative proceedings below.  (# 25, at 46-47.)  *See Dep't of Transp. v. Pub.*

*Citizen*, 541 U.S. 752, 764-65 (2004).  Defendant-intervenors argue that such an

alternative must be proposed by an objecting party during the notice and comment

periods of the EA.  (# 24, at 47.)  Plaintiff responds by arguing that it effectively raised

the issue below by proposing alternatives in its administrative appeal.  (# 26, at 12-13.)

Plaintiff did advance alternative proposals both during the notice and comment

---

[11] This case is different than the more typical case where a new activity is proposed that could have a more negative effect on the environment than the status quo.  *See, e.g.*, *New Mexico ex rel. Richardson*, 565 F.3d 683 (involving government's decision to open desert grassland to oil and gas development); *Greater Yellowstone Coalition*, 359 F.3d 1257 (involving government's decision to allow construction of a housing development and golf course in the vicinity of a bald eagle nesting territory); *Friends of the Bow*, 124 F.3d 1210 (involving government's decision to allow a timber sale from a national forest).  Here, grazing represents the status quo, the Forest Service has recognized that environmental conditions in certain areas are not moving toward desired conditions, and the Forest Service apparently recognizes that a change in management needs to occur.  The proposal potentially subject to an EIS here was a new plan to improve environmental conditions, not an approval of a new activity that would potentially be more harmful to the environment than the status quo.

period and in its administrative appeal.[12]  Under these circumstances, the court

concludes that plaintiff did not waive the argument that the Forest Service failed to

analyze a reasonable range of alternatives.[13]

### 4. Did the Forest Service Fail to Analyze a Reasonable Range of Alternatives?

The court turns next to the issue of whether the EA failed to analyze a

reasonable range of alternatives.  An EA must "include brief discussions . . . of

---

[12] (*See, e.g.*, # 29, at S06124 ("The current NEPA analysis fails to provide a reasonable range of alternatives . . . ."); *id. at* S06262 ("This implementation plan proposes as the first choice more range improvements . . . .  The first choice needs to be a realistic stocking rate [for livestock], season of use, and rotation that will result in a significant recovery [of the land]."); *id.* at S06259 ("The only thing that effectively achieves [keeping livestock distributed throughout suitable rangelands within pasture areas] is continuous daily herding . . . ."); *id.* at S06266 ("[T]he proposal to develop more of the same water developments and pipelines which have failed in the past will not distribute livestock evenly.  The only effective method for distributing livestock evenly is continuous daily herding which the Forest Service is not implementing.");  (*id.* at S06351 ("Existing alternatives that were not analyzed in the EA include grazing in the early growing season, deferred or late season grazing, rest rotation including a number of pastures, early rotation, spring and fall grazing, spring and summer grazing, and a variety of other strategies.").)

[13] Contrary to defendant-intervenors' implication, ***Department of Transportation v. Public Citizen*** did not hold that challenges under NEPA must be raised during the notice and comment period of the EA, nor did it hold that such challenges are waived if raised for the first time in an administrative appeal.  *See* **541 U.S. at 764-65**.  While the law is not entirely clear on the issue, a Tenth Circuit case has implied that raising an issue solely in an administrative appeal is sufficient to preserve the issue for judicial review.  *See **McKeen v. U.S. Forest Serv.**, 615 F.3d 1244, 1255 (10th Cir. 2010) ("[B]ecause [Plaintiff-Appellant] has not administratively appealed the terms of the permit . . ., he is precluded from seeking judicial review of said terms or of the Forest Service's basis for imposing them.").  ***But see Ariz. Pub. Serv. Co. v. U.S. Envtl. Prot. Agency***, 562 F.3d 1116, 1127 (10th Cir. 2009) ("[Petitioner] did not contest the rationality of the underlying PM limit during the comment period and, therefore, cannot raise the issue on appeal.").  This is consistent with the multitude of cases stating *generally* that an issue is waived if it was not properly raised before the administrative agency below.  *See, e.g., **Forest Guardians v. U.S. Forest Serv.**, 2011 WL 1498873 (10th Cir. 2011) ("Claims not properly raised before an agency are waived."); ***Forest Guardians v. U.S. Forest Serv.***, 495 F.3d 1162, 1170 (10th Cir. 2007) (same).

alternatives [and] of the environmental impacts of the proposed action and alternatives . . . ." 40 C.F.R. § 1508.9(b).[14]  **See also Davis v. Mineta**, 302 F.3d 1104, 1120 (10th Cir. 2002) ("A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project.").  "[W]e only consider whether an agency's decisions regarding which alternatives to discuss and how extensively to discuss them were arbitrary, keeping in mind that such decisions are necessarily bound by a rule of reason and practicality."  **Greater Yellowstone Coalition**, 359 F.3d at 1277 (citation and internal quotation marks omitted).

The court concludes that the Forest Service's selection and analysis of the three alternatives was not arbitrary and capricious.  The EA was conducted because grazing permits for national forest land were expiring, and NEPA required the Forest Service to consider the environmental impacts of its decision regarding the permits.  (*See, e.g.*, # 29, at S05940.)  One one level, the Forest Service was faced with a decision of whether to re-issue the permits (Alternative B, *see id.* at S05965-66), or allow the permits to expire and discontinue livestock grazing (Alternative A, *see id.* at S05965). Its decision was necessarily guided by its environmental assessment that, in 10 of the 29

---

[14] On the other hand, an EIS is more detailed.  An EIS

should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. [Agencies shall r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated [and d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

40 C.F.R. § 1502.14.

benchmark areas, desired environmental conditions were neither being met nor moving toward being met.  (*See id.* at S05943.)  Given that environmental assessment, if the Forest Service had only considered the two extremes of re-authorizing the permits or discontinuing them, plaintiff would have a stronger case that if the Forest Service did not consider a reasonable range of alternatives.  ***See Davis***, 302 F.3d at 1119 ("While it is true that defendants could reject alternatives that did not meet the purpose and need of the project, they could not define the project so narrowly that it foreclosed a reasonable consideration of alternatives.") (citations omitted).

Here, the Forest Service considered a third alternative – the Proposed Action – re-authorizing the permits under principles of adaptive management.  Adaptive management allows managers to implement a large number of different measures in order to change environmental conditions "toward the desired future condition or to accelerate the rate at which conditions are already moving toward desired."  (# 29, at S05966.)  Those measures include the same type of alternatives plaintiff proposed in the administrative proceedings below and in this action, such as changing the stocking rate, limiting grazing to certain seasons, rest rotation, and active herding.  (*See id.* at S05967.)  Given that the Forest Service chose a third alternative that identified the 10 problem areas, identified the environmental problems occurring in those areas, and specified the tools managers should use in moving the conditions in those areas toward desired conditions, the Forest Service did not fail to consider a reasonable range of alternatives.

## V.  CONCLUSION

For all of these reasons, the decision of the United States Forest Service to re-authorize livestock grazing in the Pike and San Isabel National Forests under principles

of adaptive management was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## VI.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That the Forest Service's decision is **AFFIRMED**;

2.  That **JUDGMENT SHALL ENTER** in favor of the defendants and the defendant-intervenors;

3.  That the defendants and the defendant-intervenors are **AWARDED** their costs to be taxed by the Clerk of the Court pursuant to FED. R. CIV. P. 54(d)(1) and D.C.COLO.LCivR 54.1; and

4.  That this case is **CLOSED**.

Dated June 16, 2011, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge